TYSON, Judge.
 

 *395
 
 John Joseph Carvalho, II ("Defendant") appeals from judgment entered upon jury verdicts finding him guilty of first-degree murder and of robbery with a dangerous weapon. We find no error in Defendant's conviction or judgment entered thereon.
 

 I. Factual Background
 

 The evidence tended to show: On 28 April 2000, George N. Kastansis ("Mr. Kastansis") died of multiple gunshot wounds at his place of business, Avondale Grocery, located in Monroe, North Carolina. A warrant was issued for Defendant's arrest on 16 November 2004, over four and one-half years later, for the murder of Mr. Kastansis. The grand jury indicted Defendant for first-degree murder and robbery with a firearm on 3 January 2005. Defendant knew Mr. Kastansis through an illegal gambling partnership they had run out of Avondale Grocery. The State's theory of guilt was that Defendant killed Mr. Kastansis, because he was preventing
 
 *81
 
 Defendant from continuing his involvement in their gambling partnership, costing Defendant "thousands of dollars."
 

 On the same date, the State also charged Defendant with the murder of Robert Long ("Mr. Long"). The grand jury indicted him for the first-degree murder of Mr. Long on 3 January 2005. The State initially filed an intention to seek the death penalty for both murders, but later requested that the trial court try both cases as non-capital. The trial court ordered both cases against Defendant be tried non-capitally on 19 December 2008.
 

 The State tried Defendant for the death of Mr. Long in 2009. The trial court declared a mistrial after the jury deadlocked. The State tried Defendant for the murder of Mr. Long a second time in 2010 and the trial court again declared a mistrial because of a deadlocked jury.
 

 The State's primary evidence against Defendant in both murders of Mr. Long and Mr. Kastansis was the testimony of an informant, William
 
 *396
 
 C. Anderson ("Anderson"). Anderson was incarcerated with Defendant in 2004. Anderson testified that during his incarceration with Defendant, Defendant purportedly confessed to killing both Mr. Long and Mr. Kastansis. Anderson testified at Defendant's first trial for the murder of Mr. Long. At Defendant's second trial for the murder of Mr. Long, Anderson invoked his Fifth Amendment right against self-incrimination and refused to testify. Anderson said he believed that if he testified he might say something incorrectly and perjure himself.
 

 When Anderson testified at Defendant's first trial for the murder of Mr. Long, the State also entered into evidence an audiotaped conversation between Anderson and Defendant ("the audiotape"). The audiotape did not contain an actual confession, but rather a wide-ranging conversation, which touched on the murders of Mr. Long and Mr. Kastansis, as well as other potentially criminal acts. The sound quality of the audiotape was very poor and the State Bureau of Investigation ("SBI") made efforts to clarify the audiotape.
 

 After Defendant's two mistrials for the murder of Mr. Long, the State again sought to secure the testimony of Anderson and to improve the quality of the audiotape. The SBI first contacted the Federal Bureau of Investigation ("FBI") for its assistance to clarify the audiotape on 24 March 2011. On 26 April 2011, the FBI stated it could not clarify the audiotape due to internal policies prohibiting such action and relinquished custody of the audiotape on 6 July 2011. The FBI recommended the SBI hire the Target Forensic Services Laboratory ("Target Forensic"). An SBI agent sent the audiotape to Target Forensic on 28 July 2011. Target Forensic completed work on the audiotape and sent the SBI a clarified version on 24 April 2012.
 

 Some portions of the audiotape remained inaudible. Anderson made handwritten notes transcribing the content of the conversation on a printed copy of the transcript to supplement the inaudible portions of the audiotape. The SBI prepared a transcript of the conversation that occurred between Anderson and Defendant during their incarceration.
 

 The conversation between Anderson and Defendant did not include a confession to the murders of either Mr. Long or Mr. Kastansis. The conversation contained details of the events surrounding Mr. Kastansis's death, including the following: (1) Defendant attended Mr. Kastansis's funeral and blessed the body with a "very ... theatrical movement[;]" (2) Defendant mentioned investigators had charged the wrong man in connection with Mr. Kastansis's murder; (3) Defendant's knowledge of and involvement in an illegal poker scam that Defendant and Mr. Kastansis
 
 *397
 
 ran out of Avondale Grocery; and, (4) Defendant's comment after investigators showed Defendant a picture of Mr. Kastansis's children, in which Defendant stated "he didn't care about [Mr. Kastansis's] kids."
 

 The remainder of the conversation covered a wide range of criminal activity, including stealing money, acting as hitman, using firearms to kill, killing a "Gypsy," how to attain serial killer status, committing murder "with control," and how to dismember a body and feed it to catfish. The conversation ended soon after Defendant suspected Anderson
 
 *82
 
 was wearing a wire, and said: "[I]t [sic] my life. The rest of my life ... you're the only one in here I talk to ... you're the only one here I trust only one I trust ... you don't think they know that?"
 

 Investigators met with Anderson on 9 December 2011 to determine his willingness to testify at Defendant's trial for the murder of Mr. Kastansis. Anderson told investigators he had refused to testify in Defendant's second trial for Mr. Long's murder "because of the way he was treated" by Union County, while in its custody. Anderson was concerned for his safety because Union County held him with other inmates, who knew he was testifying against someone in a murder trial. Anderson agreed to testify after investigators agreed to some of his stipulations. Anderson reiterated everything he had said during Defendant's trial for the murder of Mr. Long.
 

 The State initiated plea bargain discussions with Defendant in December 2012. The State and Defendant did not reach a plea agreement and discussions ended on 9 April 2013. Defendant filed a motion to dismiss the charges based upon a speedy trial violation on 3 December 2012, before the State began plea negotiations with Defendant.
 

 In his motion, Defendant asserted he was denied his constitutional right to a speedy trial due to the overall length of his imprisonment, as well as a lack of evidence sufficient to obtain a conviction due to Anderson's unwillingness to testify. Defendant also alleged his lengthy imprisonment had "crushed" any ability to post his one million dollar bond. Defendant stated defense counsel had "repeatedly" asked about the State's intentions regarding his cases, but Defendant had "received no definitive answer."
 

 The State provided the following reasons for the potential delay at the hearing on Defendant's motion to dismiss:
 

 (1) The complex nature of the cases. While factually separate and distinct from one another the two cases are intertwined in that Bill Anderson is the key witness in each case.
 

 *398
 
 (2) That with two separate murder charges significant amounts of discovery were generated.
 

 (3) Prior to both trials (Long and Kastansis) the State and defense engaged in substantial plea negotiations in an effort to find a resolution that was mutually satisfying to each Party.
 

 (4) The defendant was arraigned on the Long murder on December 16, 2008; tried in this case on September 9, 2009 which resulted in a hung jury and a mistrial on September 15, 2009.
 

 (5) The defendant was retried on the Long murder on March 22, 2010 which resulted in a hung jury and a mistrial on March 30, 2010.
 

 (6) Following the mistrial on March 30, 2010, the State sought to enhance the quality of the audio tape conversation between the defendant ... and Bill Anderson.
 

 (7) The efforts to clarify the audio recording began in March 2011 and were completed in July 2012.
 

 (8) Efforts to resolve issues with Bill Anderson to secure his testimony in future trials.
 

 On 6 June 2013, the trial court held a hearing on Defendant's motion to dismiss and entered an order denying Defendant's motion on 2 January 2014. In its written order, the trial court made the following conclusions of law:
 

 2. The length of delay 4 years 10 months (November 16, 2004 to September 8, 2009) and 5 years 4 months (November 16, 2004 to March 22, 2010) between the date the defendant was charged and his two trials in Richard Long's murder cases and a period of 8 years 7 months (November 16, 2004 to June 6, 2013) between the date the defendant was charged and the hearing on defendant's Motion to Dismiss (Speedy Trial) is sufficient enough in each case to trigger analysis of the speedy trial factors.
 

 3. The defendant ... has failed to offer any evidence to establish that neglect or willfulness by the State is the reason for delay in each case.
 

 *399
 
 4. The State's reasons for the delay in the trial of each murder case ... are reasonable
 
 *83
 
 and valid justifications for the delay in each case.
 

 5. The defendant ... until his Motion to Dismiss filed on December 3, 2012, never asserted his right to a speedy trial.
 

 6. The defendant ... failed to establish that he suffered actual, substantial prejudice as a result of the delay in the trial of his two murder cases.
 

 7. The Court in its evaluation and balancing of the four factors enumerated in
 
 Baker v. Wingo,
 
 concludes as a matter of law that the defendant's right to a speedy trial has not been violated.
 

 The State tried Defendant for the murder of Mr. Kastansis and robbery with a firearm on 7 October 2013. The trial court declared a mistrial after the jury deadlocked. Six months later, Defendant was tried a second time for the murder of Mr. Kastansis and robbery with a firearm on 1 April 2014. Defendant moved to dismiss the charges at the close of the State's evidence, and again at the close of all of the evidence. The trial court denied Defendant's motions.
 

 A jury found Defendant guilty of first-degree murder and robbery with a firearm on 7 April 2014. The trial court arrested judgment on Defendant's conviction for robbery with a dangerous weapon and sentenced Defendant to life imprisonment without parole on the first-degree murder conviction.
 

 Defendant gave notice of appeal in open court.
 

 II. Issues
 

 Defendant asserts three arguments on appeal: (1) that the almost nine years between his arrest in 2004 and his trial for the murder of Mr. Kastansis in 2013 violated his constitutional right under the Sixth Amendment to the United States Constitution and Article I, Section 8 of the North Carolina Constitution ; (2) that the trial court should have denied admission of a jailhouse audiotape and corresponding transcript because of its irrelevancy and unfairly prejudicial effect; and (3) that the trial court should have intervened in the State's closing arguments because the State used evidence, limited by the trial court to a narrow purpose, as substantive proof of Defendant's guilt.
 

 *400
 

 III. Analysis
 

 A. Speedy Trial
 

 Defendant first contends the State violated his state and federal constitutional rights to a speedy trial because an almost nine-year delay occurred between his 2004 indictment for the murder of Mr. Kastansis and Defendant's motion to dismiss in 2012.
 

 1. Standard of Review
 

 This Court applies a
 
 de novo
 
 standard of review for a constitutional issue on appeal.
 
 See
 

 State v. Tate,
 

 187 N.C.App. 593
 
 , 599,
 
 653 S.E.2d 892
 
 , 897 (2007). It is a defendant's burden to demonstrate prejudicial and reversible error. If the appellate court finds error, the State carries the burden to rebut by showing the error was harmless beyond a reasonable doubt. N.C. Gen.Stat. § 15A-1443 (2013).
 

 2. Analysis
 

 The Supreme Court of the United States established a four-factor balancing test to assess a potential violation of a defendant's right to a speedy trial, as cited by the trial court.
 
 See
 

 Barker v. Wingo,
 

 407 U.S. 514
 
 , 530-33,
 
 92 S.Ct. 2182
 
 , 2191-94,
 
 33 L.Ed.2d 101
 
 , 115-19 (1972). These factors are: (1) the "[l]ength of delay;" (2) "the reason for the delay [;]" (3) "the defendant's assertion of his right[;]" and, (4) "prejudice to the defendant."
 

 Id.
 

 at 530
 
 ,
 
 92 S.Ct. at 2192
 
 ,
 
 33 L.Ed.2d at 117
 
 .
 

 "[N]one of the four factors identified [are] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant."
 

 Id.
 

 at 533
 
 ,
 
 92 S.Ct. at 2193
 
 ,
 
 33 L.Ed.2d at 118
 
 . While the four factors guide the process, "these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process."
 

 Id.
 

 The right to a speedy trial is unique among other constitutional guarantees "in that, among other things, deprivation of a speedy trial does not
 
 per se
 
 prejudice the ability of the accused to defend himself [.]"
 

 *84
 

 State v. McKoy,
 

 294 N.C. 134
 
 , 140,
 
 240 S.E.2d 383
 
 , 388 (1978). "[I]t is impossible to determine precisely when the right has been denied; ... and dismissal of the charges is the only possible remedy for denial of the right to a speedy trial."
 

 Id.
 

 (a) Length of Delay
 

 In order to "trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold
 
 *401
 
 dividing ordinary from presumptively prejudicial."
 
 Doggett v. United States,
 

 505 U.S. 647
 
 , 651-52,
 
 112 S.Ct. 2686
 
 , 2690,
 
 120 L.Ed.2d 520
 
 , 528 (1992) (internal quotation marks omitted). As time passes, "the presumption that pretrial delay has prejudiced the accused intensifies."
 

 iD.
 

 at 652
 
 , 112 S.CT. at 2691, 120 l.ED.2d at 528. "dEpending on the nature of the charges, the lower courts have generally found post-accusation delay 'presumptively prejudicial' at least as it approaches one year."
 

 Id.
 

 at 652 n. 1,
 
 112 S.Ct. at
 
 2691 n. 1,
 
 120 L.Ed.2d at
 
 528 n. 1.
 

 Here, almost nine years elapsed between the time the State indicted Defendant in 2004 and the time of the June 2013 hearing on his motion to dismiss. This delay clearly passes the demarcation into presumptively prejudicial territory and triggers the
 
 Barker
 
 analysis.
 
 See
 

 State v. Flowers,
 

 347 N.C. 1
 
 , 27,
 
 489 S.E.2d 391
 
 , 406 (1997) (explaining "presumptive prejudice does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the
 
 Barker
 
 enquiry" (internal quotation marks omitted)),
 
 cert. denied,
 

 522 U.S. 1135
 
 ,
 
 118 S.Ct. 1094
 
 ,
 
 140 L.Ed.2d 150
 
 (1998) ;
 
 see, e.g.,
 

 Doggett,
 

 505 U.S. at 652
 
 ,
 
 112 S.Ct. at 2691
 
 ,
 
 120 L.Ed.2d at 528
 
 (calling an eight-and-one-half-year-long delay "extraordinary").
 

 The almost nine-year delay, while also "extraordinary," "is not
 
 per se
 
 determinative of whether a speedy trial violation has occurred," and requires careful analysis of the remaining factors.
 

 Id.
 
 See
 

 State v. Webster,
 

 337 N.C. 674
 
 , 678-79,
 
 447 S.E.2d 349
 
 , 351 (1994) (deciding sixteen-month delay from arrest to trial did not presumptively indicate a speedy trial violation had occurred, but was enough to "trigger examination of the other factors").
 

 (b) Reason for Delay
 

 A defendant must demonstrate the delay stemmed from either negligence or willfulness on the part of the State.
 
 State v. Marlow,
 

 310 N.C. 507
 
 , 521,
 
 313 S.E.2d 532
 
 , 541 (1984). Ordinary or reasonable delays do not create prejudice.
 
 State v. Johnson,
 

 275 N.C. 264
 
 , 273,
 
 167 S.E.2d 274
 
 , 280 (1969). A speedy trial claim prevents only those delays that were "purposeful or oppressive delays and those which the prosecution could have avoided by reasonable effort."
 

 Id.
 

 "A defendant who has himself caused the delay, or acquiesced in it, will not be allowed to convert the guarantee, designed for his protection, into a vehicle in which to escape justice."
 
 Id.
 
 at 269,
 
 167 S.E.2d at 278
 
 . Once a defendant shows a
 
 prima facie
 
 case for negligence or willfulness, the State bears the burden of showing there were reasonable circumstances surrounding the delay.
 
 See
 

 McKoy,
 

 294 N.C. at 143
 
 ,
 
 240 S.E.2d at 390
 
 .
 

 *402
 
 Defendant has failed to show the delay stemmed from either negligence or willfulness on the part of the State.
 
 Compare
 

 Webster,
 

 337 N.C. at 679
 
 ,
 
 447 S.E.2d at 351
 
 (finding a sixteen-month delay, where the district attorney calendared the trial six different times, did not demonstrate negligence or willfulness),
 
 with
 

 McKoy,
 

 294 N.C. at 141-42
 
 ,
 
 240 S.E.2d at 389
 
 (finding delay factor in favor of defendant because defendant presented evidence that the "failure to bring defendant to trial during the next ten months ... was due to the willful neglect of the prosecution and could have been avoided by reasonable effort"). Defendant presented no evidence of negligence or willfulness by the State in his motion to dismiss, or at the hearing on his motion.
 

 Defendant merely established the timeline showing how the two murder cases had proceeded over time. As discussed
 
 supra,
 
 the length of delay alone does not prove the State denied Defendant a speedy trial.
 
 See
 

 *85
 

 Webster,
 

 337 N.C. at 678
 
 ,
 
 447 S.E.2d at 351
 
 . Although Defendant asserted in his motion to dismiss that defense counsel had asked "repeatedly" for information on the progression of the cases and had received "no definitive answer," no other motions were filed and Defendant did not present any evidence regarding those inquiries.
 

 Evidence described the timelines of all four trials and the actions the State took to bring the two distinct murder cases to trial. The more significant elements that contributed to the length of the proceedings were: (1) changing the trials for Mr. Long's and Mr. Kastansis's murders from capital to non-capital; (2) plea discussions between Defendant and the State; (3) clarification of the audiotape and generation of a transcript, including seeking help from the SBI, the FBI and Target Forensic; (4) securing the testimony of the State's key witness, Anderson; and, (5) the interconnectedness of the two murders. While we are concerned about the sixteen-month delay from enhancing the audiotape previously used at Defendant's trials for the murder of Mr. Long, Defendant has failed to carry his burden of showing the reasons for the delays stemmed from either negligence or willfulness on the part of the State.
 

 (c) Assertion of the Right
 

 Defendant's failure to demand a speedy trial does not result in a waiver of the speedy trial violation.
 
 See
 

 Barker,
 

 407 U.S. at 528
 
 ,
 
 92 S.Ct. at 2191
 
 ,
 
 33 L.Ed.2d at 115
 
 . While a "[d]efendant's failure to assert his right to a speedy trial sooner in the process does not foreclose his speedy trial claim, [it] does weigh against his contention that he has been denied his constitutional right to a speedy trial."
 
 Flowers,
 

 347 N.C. at 28
 
 ,
 
 489 S.E.2d at 407
 
 . Defendant first asserted his right to a speedy trial on 3 December 2012,
 
 *403
 
 some eight years after Defendant was first indicted in 2004. No evidence in the record shows Defendant requested or moved for a speedy trial any earlier than in 2012.
 

 (d) Prejudice Resulting from Delay
 

 Prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect."
 
 Barker,
 

 407 U.S. at 532
 
 ,
 
 92 S.Ct. at 2193
 
 ,
 
 33 L.Ed.2d at 118
 
 . The identified interests the constitutional right to a speedy trial protects are: (1) avoiding prolonged imprisonment; (2) reducing anxiety of the accused; and (3) creating the opportunity for the accused to assert and exercise their presumption of innocence.
 
 See
 
 id.
 

 The last of these interests is the most important aspect to the speedy trial right, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."
 

 Id.
 

 Defendant has not shown any affirmative proof of prejudice. He asserts only his lengthy incarceration "crushed" any financial ability to post his one million dollar bond. Defendant does not argue he was either unduly anxious or that his case preparation was impaired by the delay.
 
 Compare
 

 Flowers,
 

 347 N.C. at 29
 
 ,
 
 489 S.E.2d at 407
 
 (finding that defendant failed to show prejudice when he was already incarcerated, alleviating concerns over oppressive pretrial incarceration, and any allegation of impairment to his defense was not supported by the record),
 
 with
 

 State v. Chaplin,
 

 122 N.C.App. 659
 
 , 665,
 
 471 S.E.2d 653
 
 , 657 (1996) (finding prejudice when the defendant could no longer find his key witness).
 

 We have reviewed and considered each of the
 
 Barker
 
 factors. Defendant failed to carry his burden to demonstrate a speedy trial violation. We affirm the trial court's ruling denying Defendant's motion to dismiss. We hold the trial court did not err after it determined the State did not violate Defendant's state or federal constitutional right to a speedy trial. Defendant's argument is overruled.
 

 B. Admission of Audiotape and Corresponding Transcript
 

 Defendant argues the trial court erred in admitting, over his objection, portions of the audiotape and corresponding transcript, which included a conversation between Defendant and Anderson, while both men were incarcerated.
 

 Defendant challenges portions of the audiotape and transcript in which Defendant discusses: (1) plans to commit a future armed robbery and murder; (2) how many killings it takes to become a serial killer; (3)
 

 *86
 
 becoming a hitman; (4) committing murder "with control;" and (5) dismembering a body and feeding it to catfish. Defendant contends the
 
 *404
 
 evidence was irrelevant under Rules 401 and 404(b) and unfairly prejudicial under Rule 403, and should have been excluded. We disagree.
 

 1. Standard of Review
 

 Our Supreme Court held:
 

 when analyzing rulings applying Rules 404(b) and 403, we conduct distinct inquiries with different standards of review. When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling ... we look to whether the evidence supports the findings and whether the findings support the conclusions. We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion.
 

 State v. Beckelheimer,
 

 366 N.C. 127
 
 , 130,
 
 726 S.E.2d 156
 
 , 159 (2012).
 

 "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision."
 
 State v. Hayes,
 

 314 N.C. 460
 
 , 471,
 
 334 S.E.2d 741
 
 , 747 (1985) (citation omitted).
 

 2. Analysis
 

 (a) 404(b) Evidence
 

 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." N.C. Gen.Stat. § 8C-1, Rule 404(b) (2013). However, evidence of a defendant's prior crimes, statements, actions and conduct is admissible, if relevant to any fact or issue other than the defendant's character.
 
 Beckelheimer,
 

 366 N.C. at 130-31
 
 ,
 
 726 S.E.2d at 159
 
 .
 

 North Carolina Rules of Evidence 404(b) is a rule of inclusion, not exclusion.
 
 Id.
 
 at 131,
 
 726 S.E.2d at 159
 
 .
 
 See also
 

 State v. Coffey,
 

 326 N.C. 268
 
 , 278-79,
 
 389 S.E.2d 48
 
 , 54 (1990).
 

 The rule lists numerous purposes for which evidence of prior acts may be admitted, including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident. This list is not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue [at trial]....
 

 Beckelheimer,
 

 366 N.C. at 130
 
 ,
 
 726 S.E.2d at 159
 
 (internal citations and quotation marks omitted).
 

 *405
 
 Our Supreme Court has ruled Rule 404(b) is "subject to but
 
 one exception
 
 requiring the exclusion of evidence if its
 
 only
 
 probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged."
 
 State v. Lyons,
 

 340 N.C. 646
 
 , 668,
 
 459 S.E.2d 770
 
 , 782 (1995) (emphasis in original) (citation omitted).
 

 The trial court found the audiotape and transcript of portions of Defendant's conversations with Anderson served a "proper purpose," in that "these statements are necessary to show the full context of the confidential relationship between Mr. Anderson and [Defendant]."
 

 Anderson's credibility was crucial to the State's case and this finding clearly falls within the purview of admissible evidence under Rule 404(b).
 
 See
 

 State v. White,
 

 340 N.C. 264
 
 , 285-86,
 
 457 S.E.2d 841
 
 , 853 (1995) (holding "knowledge of the relationship between [the witness] and defendant was necessary in order for the jury to assess [the witness's] credibility and determine what weight to give his testimony");
 
 State v. Agee,
 

 326 N.C. 542
 
 , 548,
 
 391 S.E.2d 171
 
 , 174 (1990) (noting 404(b) evidence is admissible if it serves to enhance the natural sequence or development of facts).
 

 This evidence was properly admitted under the North Carolina Rules of Evidence, Rule 404(b).
 
 Coffey,
 

 326 N.C. at 278-79
 
 ,
 
 389 S.E.2d at 54
 
 (holding Rule 404(b) is a rule of inclusion). The trial court also gave the jury a limiting instruction regarding the purpose for which the jury could consider the evidence. The jury is presumed to have followed these instructions.
 
 State v. Montgomery,
 

 291 N.C. 235
 
 , 244,
 
 229 S.E.2d 904
 
 , 909 (1976) (citation omitted) ("We assume, as our system for administration of justice requires,
 
 *87
 
 that the jurors in this case were possessed of sufficient character and intelligence to understand and comply with th[e limiting] instruction by the court.").
 

 Defendant's conversation with Anderson was not admitted to show Defendant had a propensity to commit crimes. Rather, the challenged portions of the conversation were admitted for the limited purposes to show: (1) Defendant trusted and confided in Anderson; (2) the nature of their relationship, in that Defendant was willing to discuss the commission of murder and robbery with Anderson; and (3) relevant factual information to Defendant's murder charge for which he was on trial. The challenged portions of the conversations bolstered Anderson's credibility as a witness. The trial court did not err in concluding that Rule 404(b) permitted admission of these statements into evidence.
 

 *406
 

 (b) Rule 403 -Unfair Prejudice
 

 The trial court's admission of portions of the audiotape and transcript also did not violate Rule 403. "Evidence which is probative of the State's case necessarily will have a prejudicial effect upon the defendant; the question is one of degree."
 
 Coffey,
 

 326 N.C. at 281
 
 ,
 
 389 S.E.2d at 56
 
 (citation omitted). The trial court determined the probative value of this evidence was not substantially outweighed by any prejudicial effect the admission of this evidence would have on Defendant "based on the State's purpose for offering this evidence."
 

 The trial court also gave a specific limiting instruction to the jury, both at the time the audiotape was played before the jury and during the instruction to the jury. This limiting instruction stated:
 

 Evidence has also been received tending to show that Bill Anderson and the defendant ... engaged in conversations concerning the future commission of criminal acts, serial killing, and the dismembering of a body.
 
 This evidence was received solely for the purpose of showing the nature and context of the relationship between Bill Anderson and ... [Defendant].
 

 (emphasis supplied).
 

 The trial court redacted some of the transcript, balanced the factors to allow admission of the remaining portions, and found the admission of the audiotape and transcript was for a permissible purpose under Rule 404(b). The trial court also specifically limited its use in its instructions to the jury. Defendant has failed to show the trial court's process or admission of this evidence constitutes an abuse of discretion.
 

 Defendant argues any relevance of this evidence was outweighed by "danger of unfair prejudice." N.C. Gen.Stat. § 8C-1, Rule 403 (2013). Under the applicable standard of review, this Court cannot substitute its own judgment for that of the trial court. Given the importance of the credibility of Anderson's testimony to the State's case, we cannot conclude the trial court was manifestly unreasonable in determining the relevance of the redacted version of the transcript, when combined with the limiting instruction, substantially outweighed any unfair prejudice to Defendant. When combined with the trial court's limiting jury instruction, the probative value substantially outweighed any unfair prejudice to Defendant.
 

 Id.
 

 Defendant has failed to show the admission of this evidence violated Rule 403.
 
 State v. Lanier,
 

 165 N.C.App. 337
 
 , 345,
 
 598 S.E.2d 596
 
 , 602 (2004) (citation and internal quotation marks omitted)
 

 *407
 
 ("In each case, the burden is on the defendant to show there was no proper purpose for which the evidence could be admitted [under Rule 404(b) ]."). Defendant's argument is overruled.
 

 C. Closing Arguments
 

 Defendant asserts the State's closing arguments were "grossly improper," and warrant a new trial. We disagree.
 

 1. Standard of Review
 

 "The standard of review when a defendant fails to object at trial is whether the closing argument complained of was so grossly improper that the trial court erred in failing to intervene
 
 ex mero motu.
 
 "
 
 State v. McCollum,
 

 177 N.C.App. 681
 
 , 685,
 
 629 S.E.2d 859
 
 , 861-62 (2006) (citation and internal quotation marks omitted).
 

 "In determining whether the prosecutor's argument was ... grossly improper, this Court must examine the argument in the
 
 *88
 
 context in which it was given and in the light of the overall factual circumstances to which it refers."
 
 State v. Hipps,
 

 348 N.C. 377
 
 , 411,
 
 501 S.E.2d 625
 
 , 645 (1998). "[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting
 
 ex mero motu
 
 an argument which defense counsel apparently did not believe was prejudicial when he heard it."
 

 Id.
 

 (citation and internal quotation marks omitted).
 

 2. Analysis
 

 The Supreme Court of the United States held for a new trial to be granted for remarks made during closing arguments,
 

 it is not enough that the prosecutor['s] remarks were undesirable or even universally condemned. The relevant question is whether the prosecutor['s] comments so infected the trial court with unfairness as to make the resulting conviction a denial of due process.
 

 Darden v. Wainwright,
 

 477 U.S. 168
 
 , 181,
 
 106 S.Ct. 2464
 
 , 2471,
 
 91 L.Ed.2d 144
 
 , 157 (1986) (citations and internal quotation marks omitted).
 

 The State used evidence from the audiotape and transcript throughout its closing argument. However, the State did not mention nor discuss Defendant's conversations with Anderson about: (1) the commission of criminal acts in the future; (2) serial killing; (3) being a hitman; or, (4) dismembering a body and feeding it to the catfish. These portions of Defendant's and Anderson's conversation were admitted into evidence solely for the limited purposes stated above.
 

 *408
 
 The State did not ask the jury to use the challenged evidence to convict Defendant of the crimes for which he was on trial, nor did the State ask the jury to use the evidence admitted in any other improper manner.
 

 To the extent Defendant's remark that murder must be committed with "control," which occurred during his discussion of serial killers and hitman, fell within the scope of the trial court's limiting instruction, we cannot conclude the State's references to this statement were so grossly improper that the trial court should have intervened
 
 ex mero motu. See
 

 State v. Stokes,
 

 357 N.C. 220
 
 , 227,
 
 581 S.E.2d 51
 
 , 56 (2003) (prosecutor's comments during closing argument to effect that inculpatory statement murder defendant made to sheriff deputy, offered to impeach defendant, should be considered as substantive testimony, was not so grossly improper that trial court abused its discretion in failing to intervene
 
 ex mero motu;
 
 instruction given was adequate to advise jury that defendant's statement, which he denied making, was being admitted for limited purpose of impeaching defendant's truthfulness).
 

 Defendant failed to object to the State's closing arguments at trial. It is difficult, now on appeal, to credit and accept his argument that the State's closing argument constituted "an extreme impropriety."
 
 State v. Anthony,
 

 354 N.C. 372
 
 , 427,
 
 555 S.E.2d 557
 
 , 592 (2001).
 

 Defendant has failed to establish any gross or plain error or impropriety in the State's closing arguments to warrant a new trial. The State's closing arguments did not "so infect[ ] the trial with unfairness that they rendered the conviction fundamentally unfair."
 
 State v. Davis,
 

 349 N.C. 1
 
 , 23,
 
 506 S.E.2d 455
 
 , 467 (1998) (citation omitted),
 
 cert. denied,
 

 526 U.S. 1161
 
 ,
 
 119 S.Ct. 2053
 
 ,
 
 144 L.Ed.2d 219
 
 (1999).
 

 IV. Conclusion
 

 Defendant failed to carry his burden of showing either any negligence or willfulness by the State caused the length of delay in his trial. Even with a troubling and "extraordinary" almost nine-year delay, Defendant's state and federal constitutional right to a speedy trial were not violated.
 
 Doggett,
 

 505 U.S. at 652
 
 ,
 
 112 S.Ct. at 2691
 
 ,
 
 120 L.Ed.2d at 528
 
 .
 

 The challenged portions of the audiotaped conversation between Defendant and Anderson were relevant and properly admitted into evidence under Rules 401, 403, and 404(b). Defendant has failed to demonstrate that the trial court abused its discretion in determining the probative value of the audiotaped conversation substantially outweighed any unfair prejudice.
 

 *409
 
 Defendant has failed to carry his burden of showing any gross or plain error or impropriety
 
 *89
 
 in the State's use of the audiotaped conversation during closing arguments.
 

 Defendant received a fair trial free from prejudicial errors he preserved and argued. We find no error in Defendant's conviction or the judgment entered thereon.
 

 NO ERROR.
 

 Judge GEER concurs.
 

 Chief Judge McGEE concurs in part and dissents in part in a separate opinion.
 

 McGEE, Chief Judge, concurring in part, dissenting in part.
 

 I concur in the majority's opinion that Defendant failed to carry his burden to demonstrate that the State violated his constitutional right to a speedy trial and that Defendant failed to carry his burden of showing any gross or plain error or impropriety in the State's closing arguments. However, I respectfully dissent from the majority's determination that the challenged portions of the audiotape and corresponding transcript were properly admitted as evidence under N.C. Gen.Stat. § 8C-1, Rule 404(b).
 

 As the majority recognizes, the North Carolina Supreme Court recently held that N.C. Gen.Stat. § 8C-1, Rules 404(b) and 403 require "distinct inquiries with different standards of review."
 
 State v. Beckelheimer,
 

 366 N.C. 127
 
 , 130,
 
 726 S.E.2d 156
 
 , 159 (2012). Specifically, "[w]e review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion."
 

 Id.
 

 Rule 404(b) generally is a "rule of
 
 inclusion
 
 " and "evidence of other offenses is
 
 admissible
 
 so long as it is
 
 relevant to any fact or issue other than
 
 the character of the accused."
 
 State v. Coffey,
 

 326 N.C. 268
 
 , 278,
 
 389 S.E.2d 48
 
 , 54 (1990) (internal quotation marks omitted). While evidence is not admissible to prove the character of the accused, it ordinarily is admissible for purposes such as "to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, entrapment, or accident," as well as for other purposes not enumerated in the rule.
 
 State v. Cashwell,
 

 322 N.C. 574
 
 , 578,
 
 369 S.E.2d 566
 
 , 568 (1988). For
 
 *410
 
 instance, our Supreme Court has concluded that a defendant's inculpatory statements to another may be properly admitted under Rule 404(b) where such testimony is necessary to " show a confidential relationship between th[at] witness and the defendant," when knowledge of such a relationship "was necessary in order for the jury to assess [the testifying witness's] credibility and determine what weight to give his testimony concerning [the] defendant's confession to th[e] crime."
 
 State v. White,
 

 340 N.C. 264
 
 , 285-86,
 
 457 S.E.2d 841
 
 , 853,
 
 cert. denied
 
 ,
 
 516 U.S. 994
 
 ,
 
 116 S.Ct. 530
 
 ,
 
 133 L.Ed.2d 436
 
 (1995).
 

 In support of Defendant's assertion that the trial court erred by admitting the challenged portions of the audiotape and transcript in which Defendant and Anderson discussed plans to commit a future armed robbery and murder, how many killings it takes to become a serial killer, becoming a hitman, committing murder "with control," and dismembering a body and feeding it to catfish, Defendant directs this Court's attention to
 
 State v. Cashwell,
 

 322 N.C. 574
 
 ,
 
 369 S.E.2d 566
 
 (1988), and
 
 State v. White,
 

 340 N.C. 264
 
 ,
 
 457 S.E.2d 841
 
 (1995).
 

 In
 
 Cashwell,
 
 the defendant was charged with two counts of first-degree murder.
 
 Cashwell,
 

 322 N.C. at 574
 
 ,
 
 369 S.E.2d at 566
 
 . While the defendant was in jail for an unrelated charge of the attempted murder of his girlfriend, the defendant told a fellow inmate about the charge for which he was then presently in jail and, about a month later, made incriminating statements to the same inmate concerning the details of the first-degree murder charges.
 
 See
 

 id.
 

 at 575-76
 
 ,
 
 369 S.E.2d at 567
 
 . At trial, the State introduced evidence from the inmate and from a detective corroborating the inmate's testimony that the defendant said he was in jail for the attempted murder of his girlfriend.
 
 See
 

 id.
 

 at 576
 
 ,
 
 369 S.E.2d at 567
 
 . The State argued that the inmate's testimony and the detective's corroborating testimony about the attempted murder charge "were competent for the purpose of showing the relationship between [the inmate] and [the] defendant that led up to [the] defendant's inculpatory statements a month later" concerning the
 
 *90
 
 first-degree murder charges.
 

 Id.
 

 at 577
 
 ,
 
 369 S.E.2d at 568
 
 .
 

 However, the
 
 Cashwell
 
 Court determined that, in accordance with the definition of "relevant evidence" under N.C. Gen.Stat. § 8C-1, Rule 401, "the testimony of these two witnesses that [the defendant] was in jail on a charge of attempted murder of his girlfriend [wa]s not relevant," because this statement by the defendant "[did] not go to prove the existence of any fact that [wa]s of consequence in the determination of the two charges of murder on which defendant was found guilty."
 

 Id.
 

 The
 
 Cashwell
 
 Court further determined that such evidence "was not relevant
 
 *411
 
 to any fact or issue other than the character of the accused[,]" contrary to the proscription of N.C. Gen.Stat. § 8C-1, Rule 404.
 

 Id.
 

 at 578
 
 ,
 
 369 S.E.2d at 568
 
 . Because the Court concluded "[t]he challenged testimony in no way was necessary to show the full context of [the] defendant's confession, nor was it required in order to show any confidential relationship between [the] defendant and [the testifying inmate,]"
 

 id.,
 

 the Court found this testimony to be " irrelevant and immaterial to the later inculpatory statements made by [the] defendant to [the inmate about the first-degree murder charges.]"
 

 Id.
 

 Accordingly, after determining that the admission of such testimony constituted prejudicial error, the
 
 Cashwell
 
 Court held that the defendant was entitled to a new trial.
 

 Id.
 

 at 580
 
 ,
 
 369 S.E.2d at 569
 
 .
 

 In
 
 White,
 
 the defendant was tried in 1993 for the first-degree murder of her four-year-old stepson.
 
 White,
 

 340 N.C. at 270-71
 
 ,
 
 457 S.E.2d at 845
 
 . After the child's death in 1973, which was originally determined to be accidental, the medical examiner "extracted a large piece of a plastic laundry bag from the child's throat," which "was tightly wadded up," "came out in one piece," and "was large enough to cover [an adult's] hand and three-fourths of [an adult's] arm."
 
 Id.
 
 at 271-72,
 
 457 S.E.2d at 845
 
 . Almost twenty years later, the defendant was alleged to have conspired to kill her husband.
 
 Id.
 
 at 272,
 
 457 S.E.2d at 846
 
 . During one of the six meetings the defendant had with her co-conspirators to allegedly discuss her husband's murder, one of the co-conspirators "expressed hesitation about taking someone's life, and [the] defendant encouraged [him] to murder her husband" by telling him: " '[I]t's not that hard to do. I had a step-child. I put a bag over it until it stopped breathing. It was better off.' "
 

 Id.
 

 At the defendant's trial in
 
 White
 
 for the murder of her stepson, the defendant moved to exclude the evidence of her alleged involvement in her husband's murder on the grounds that the admission of this evidence would violate Rules 404(b) and 403, which motion was denied.
 
 Id.
 
 at 281,
 
 457 S.E.2d at 851
 
 . The defendant argued that "the only probative value of this evidence was to show that she had the propensity to commit murder and that because she had conspired to murder her husband, she must also have murdered her stepson twenty years before."
 
 Id.
 
 at 283,
 
 457 S.E.2d at 852
 
 .
 

 However, in
 
 White,
 
 the trial court found that the evidence of the defendant's "involvement in the conspiracy" to murder her husband "was necessary for the natural development of the facts and to complete the story of this murder for the jury, in particular, to explain the context of [the] defendant's confession to [the co-conspirator] that she murdered
 
 *412
 
 her stepchild by smothering him with a plastic bag."
 
 Id.
 
 at 284,
 
 457 S.E.2d at 853
 
 . Our Supreme Court agreed that the defendant's confession to her co-conspirator "would have been difficult to understand without the historical details and context giving rise to the statement,"
 

 id.,
 

 and determined that, "[a]bsent evidence of [the] defendant's relationship with [the co-conspirator], the jury would have been unable to determine [the witness's] credibility or what weight to give his testimony."
 

 Id.
 

 Thus, the Court concluded that, "[e]ven though the two incidents were separated by nineteen years, they were inextricably intertwined, and it would have been impossible to develop this relationship for the jury without revealing [the] defendant's participation in the conspiracy to murder her husband."
 
 Id.
 
 at 284-85,
 
 457 S.E.2d at 853
 
 . Accordingly, the Court held that this evidence "was not merely probative of [the] defendant's propensity to commit murder and was properly admitted under Rule 404(b)."
 
 Id.
 
 at 285,
 
 457 S.E.2d at 853
 
 .
 
 *91
 
 In
 
 White,
 
 the Court distinguished
 
 Cashwell
 
 by recognizing that, in
 
 Cashwell,
 
 in order to show a confidential relationship between the witness and the defendant, the defendant's "inculpatory statement to his cellmate about the attempted murder of the defendant's girlfriend" was "not necessary to show the context" in which the "additional inculpatory statements to his cellmate about a different crime, a double murder, for which he was eventually tried," were made, because the first statement was "irrelevant and immaterial to the subsequent inculpatory statement."
 
 White,
 
 340 N.C. at 285,
 
 457 S.E.2d at 853
 
 . However, the Court determined that, in
 
 White,
 
 "knowledge of the relationship between [the co-conspirator] and [the] defendant was necessary in order for the jury to assess [the witness's] credibility and determine what weight to give his testimony concerning [the] defendant's confession to th[e] crime."
 
 Id.
 
 at 285-86,
 
 457 S.E.2d at 853
 
 . The Court further determined that the defendant's statement was "inextricably intertwined with the evidence of [the] defendant's alleged involvement in her husband's murder and could not be meaningfully isolated."
 
 Id.
 
 at 286,
 
 457 S.E.2d at 853-54
 
 . Thus, the
 
 White
 
 Court concluded that the challenged testimony was properly admitted under Rule 404(b), and that the trial court did not abuse its discretion under Rule 403 "by concluding that the probative value of the
 
 interwoven evidence
 
 of [the] defendant's confession and involvement in her husband's murder outweighed any prejudicial effect such evidence might have had against her."
 
 Id.
 
 at 286,
 
 457 S.E.2d at 854
 
 (emphasis added).
 

 In the present case, Defendant objected to portions of the transcript that dealt with plans to commit a future armed robbery and murder,
 
 *413
 
 how many killings it takes to become a serial killer, becoming a hitman, committing murder "with control," and dismembering a body and feeding it to catfish. As the majority recognizes, "[t]he trial court found the audiotape and transcript of portions of Defendant's conversations with Anderson served a 'proper purpose,' in that 'these statements [we]re necessary to show the full context of the confidential relationship between [Anderson] and [Defendant].' " However, I disagree with the majority's conclusion that "this finding clearly falls within the purview of admissible evidence under Rule 404(b)." Without the challenged portions of the audiotape and transcript, the remaining conversation between Defendant and Anderson would have been sufficient to demonstrate the confidential nature of their relationship. In the unchallenged portions of the audiotape and transcript, Defendant and Anderson openly discussed elements surrounding Mr. Kastansis's death, including Defendant's " theatrical" blessing of Mr. Kastansis's body, Defendant's attempt to implicate a man who sold cigarettes at Avondale Grocery as Mr. Kastansis's murderer, Defendant's knowledge and involvement in the illegal poker scam run out of Avondale Grocery, and Defendant's lack of empathy towards Mr. Kastansis's children. Furthermore, additional testimony at trial established that Anderson and Defendant knew each other before their incarceration through family connections and by Defendant's habit of frequenting Avondale Grocery. Thus, unlike
 
 White,
 
 the challenged portions of the audiotape and transcript in the present case were not so "inextricably intertwined" as to require their admission, nor were they "necessary in order for the jury to assess [Anderson's] credibility and determine what weight to give his testimony[.]"
 
 See
 

 White,
 

 340 N.C. at 285-86
 
 ,
 
 457 S.E.2d at 853
 
 . Instead, as in
 
 Cashwell,
 
 "[t]he challenged testimony in no way was necessary ... in order to show any confidential relationship between [D]efendant and [Anderson.]"
 
 See
 

 Cashwell,
 

 322 N.C. at 578
 
 ,
 
 369 S.E.2d at 568
 
 .
 

 Therefore, while I agree with the majority that "Anderson's credibility was crucial to the State's case," because I believe the challenged evidence was irrelevant and immaterial and not admitted for a proper purpose under N.C. Gen.Stat. § 8C-1, Rule 404(b), I must respectfully dissent.